Roberto NAVARRO–AYALA, et al., Plaintiffs, Appellees,

v.

Rafael HERNANDEZ–COLON, et al., Defendants, Appellants.

No. 90–1339.

United States Court of Appeals, First Circuit.

Heard Nov. 8, 1990.

Decided Dec. 18, 1991.

Jorge E. Perez–Diaz, Sol. Gen., Dept. of Justice, with whom Norma Cotti–Cruz, Deputy Sol. Gen., was on brief, for appellants.

Armando Cardona–Acaba, Puerto Rico Legal Services, for appellees.

Before CAMPBELL, TORRUELLA and CYR, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The two issues raised by this appeal are: (1) whether the action below is a class action, even though the district court never certified a class as required by Fed. R.Civ.P. 23(c)(1), and gave no notice to class members; and (2) whether the stipulation executed by the parties and approved and entered in the court record by the district court in 1977 conferred authority on the district court to regulate the care given certain patients at a separate psychiatric facility located some distance from the institution named in the original action. We hold that this suit is a class action and that the provisions of the stipulation do not apply at the other institution.

## SUMMARY OF FACTS AND ISSUES

In 1974 Roberto Navarro Ayala ("Navarro"), a mentally retarded patient at the Psychiatric Hospital of the Commonwealth of Puerto Rico, a public mental health institution located in Río Piedras, San Juan ("Hospital" or "Río Piedras"), filed a complaint under 42 U.S.C. § 1983 in the District Court for the District of Puerto Rico, on behalf of himself and all others at the Hospital, asserting that the inhumane conditions there violated plaintiffs' constitutional rights. Included as defendants were the Governor and other Commonwealth officials having control over the Hospital.

In 1977, before trial, the parties executed, and the district court approved, a stipulation effectively ending the suit. The stipulation provided for numerous specified improvements in respect to what was termed the "institution and its residents." The word "institution" was defined in the stipulation as being "The Commonwealth of Puerto Rico Psychiatric Hospital as presently constituted or in Decentralized form."

In the ensuing fourteen years, defendants have taken many steps under the supervision of the district court to comply with the terms of the stipulation. Recently, however, disputes have arisen as to the court's right to force the defendants to apply the stipulated measures at a different facility known as the Guerrero Therapeutic Community ("Guerrero") to which certain of the Hospital's former patients were sent as part of the process of relieving overcrowding at the Hospital. Defendants contend (1) that the district court's jurisdiction is limited to ordering relief to Navarro personally, the only named plaintiff, because a class of patients was never certified, and notice was never given to the class; and (2) that the stipulation currently governs only the care and treatment of patients at the Psychiatric Hospital in Río Piedras, within the municipality of San Juan, and does not regulate the care and treatment of patients at Guerrero.

In a March 6, 1990 "Opinion and Order," the district court held that this suit was a class action. The court also reaffirmed its position that it had "jurisdiction" not only over Río Piedras but also over Guerrero in respect to the treatment and living conditions of former Río Piedras patients there. Defendants appealed from these rulings.

## BACKGROUND

### A. The Institution

During the early part of the 1970s, as now, the Psychiatric Hospital in Río Piedras, San Juan, was one of the hospitals offering mental health services as part of the Commonwealth of Puerto Rico's Department of Health Mental Health Program. In the words of the 1977 stipulation, the Hospital offered hospitalization 24 hours a day, emergency psychiatric services and admissions, and outpatient psychiatric services. According to the stipulation, referrals came "from the Northeastern Region of Mental Health Centers of Arecibo, Manatí, Bayamón, Caguas, Carolina, Fajardo, Humacao, San Patricio and Cayey." (We take judicial notice that the Guerrero Therapeutic Community in dispute is located outside and to the west of the above-named communities; its locus, the city of Aguadilla, is in the northwest corner of Puerto Rico, roughly 70 miles from San Juan.)

In the early 1970s the Hospital was badly overcrowded and urgently in need of improvement. According to allegations of plaintiffs' complaint, it lacked essential physical facilities, such as lockers where patients could safely keep their personal belongings, clocks in all wards, visible calendars, lamps, night tables, lounging areas with comfortable chairs, pictures, magazines, books and other items of normal daily living. Beds in the wards did not have pillows, the laundry service was faulty, and the bathrooms and hallways were not deodorized. Patients would be placed naked in isolation rooms which lacked toilet facilities. Not only were the facilities faulty, but so, too, was the treatment. Therapeutic treatment was insufficient, as the Hospital was understaffed. Many patients allegedly did not have comprehensive habilation plans addressed to their individual needs; and, in some wards,

patients were grouped according to their geographical origin, regardless of their mental condition and needs.

### B. *The Plaintiff*

"Navarro" was referred to a social worker at the Psychiatric Hospital in Río Piedras in 1970, when he was 19 years old because of "abnormal behavior." After attempts to treat Navarro's mental illness using only out-patient services had failed, his mother had him committed to the Hospital in April of 1974.

### C. *Evolution of this Appeal*

On November 25, 1974, Navarro, represented by his mother, Maria Ayala, filed a complaint in the District Court for the District of Puerto Rico "on behalf of all allegedly mentally incapacitated persons now residents at the Psychiatric Hospital ... or that are receiving mental treatment in said Hospital." The complaint contained detailed allegations criticizing conditions at the Hospital and the treatment received by patients therein; included were the allegations outlined above. The complaint alleged that these conditions at the Psychiatric Hospital violated provisions of the Bill of Rights of the United States Constitution, depriving Navarro of his right to privacy, his right not to be subjected to cruel and unusual punishment, his right not to be subjected to involuntary servitude, his right to equal protection under the law, and his right to treatment. The complaint alleged that the Psychiatric Hospital "is not a therapeutic institution. It resembles a prison...." It further alleged that the Psychiatric Hospital's environment "is inhumane and psychologically destructive" due to overcrowding and lack of minimal physical and health facilities. Other inadequacies of the Psychiatric Hospital were delineated. While describing at length the wretched conditions at the Psychiatric Hospital, the complaint did not allege similar inadequacies at any other of the Commonwealth's mental health facilities. The prayers in the complaint sought declaratory and injunctive relief solely at the Hospital: they requested a declaration that the Psychiatric Hospital did not meet constitution-

ally minimum standards; a judicial determination of what proper standards the Constitution required for residents of the Psychiatric Hospital; and an injunction against the unconstitutional conditions there. The court was asked to enjoin further admissions to the Hospital until it had determined that the Hospital met such standards as the court specified.

The complaint named as defendants: Rafael Hernández Colón, as Governor of the Commonwealth of Puerto Rico; José Alvarez de Choudens, then Secretary of Health of the Commonwealth; José A. Nuñez–López, then Assistant Secretary of Health; Erick Santos, then Director of the Commonwealth's Psychiatric Hospital; Concepción Pérez, then Administrator of the Hospital Center of Puerto Rico, and their "agents, employees and/or successors in office."

### *1975—June 1977: The Stipulation*

The defendants answered the complaint on March 21, 1975, denying most of its allegations, including that the suit was properly a class action. The defendants also denied that the district court had jurisdiction. However, before the case could be set for pretrial in May 1977, all parties engaged in negotiations resulting in agreement on the terms of a comprehensive stipulation in settlement of the lawsuit. On April 20, 1977, they submitted the stipulated agreement for the court's approval. The remedying of the existing conditions at the Psychiatric Hospital was the central theme of the stipulation; it included 86 standards that the parties stipulated would be observed at the Hospital. Short term plans included removal of the mentally retarded and other long term patients who did not require this type of hospital care to the Cayey and Bayamón Psychosocial and Rehabilitation Centers, and included the placement of additional patients in the foster home care program. The agreement contained no express provisions that the 86 standards, or any of them, would be effectuated at the Cayey and Bayamón facilities, nor did it mention at all the Guerrero Therapeutic Community in Aguadilla. The

court approved the stipulation and on June 3, 1977 entered judgment "in accordance with all the agreements made by the parties."

### Appointment of the Special Master

Between July 1977 and 1984, there was little activity in the case. On January 31, 1985, the district court held a status conference, and, on February 1, 1985, entered an order granting plaintiff's request that a master be appointed.[1] On February 8, 1985, the court appointed Dr. David Helfeld, former Dean of the University of Puerto Rico Law School, as Special Master ("Master"). The court charged the Master to see to the carrying out of the stipulation within the shortest feasible time period. The Master periodically informed the district court of his monitoring activities, and made recommendations on ways to achieve compliance. The Master asserted in several of his recommendations that bringing Río Piedras into compliance with the consent decree would require improvements to other facilities as well as to Río Piedras. As of November 1990, a total of thirteen reports had been filed with the district court.

On April 10, 1985, a hearing was held before the Master on plaintiff Navarro's condition. The director of the Hospital thereafter took measures to provide Navarro with the care required by the consent decree. An individual treatment plan was prepared for him.

### 1986—1990

By April 11, 1986, the Hospital was still overcrowded. The Hospital's total census was 421, not counting 64 patients out on passes. Only 312 beds were available and, according to the Hospital's medical director, 296 was the ideal number of patients until adequate staffing could be provided. A number of alternatives to solve this problem were discussed by the defendants and the Master. During this period the Commonwealth made available additional funds totaling $8 million for all mental health programs.

After tendering his preliminary fourth report, the Master asked the defendants for a compliance proposal that would bring the case to a close. After several drafts of a compliance plan had been proposed and rejected, on June 29, 1987, the Secretary of Health submitted a third plan ("Plan 3"). Plan 3 proposed converting the Hospital into a 250-bed hospital treating only acute and subacute patients,[2] and transferring less severe patients to outside private facilities paid for by the Department. Pressure on the emergency ward was to be relieved through the use of three ambulatory facilities. Facilities in San Patricio and Caguas, both located in the San Juan metropolitan area, would receive emergency patients from the western and southern parts of the metropolitan area, respectively. The Guerrero Therapeutic Community, located on the western side of Puerto Rico in Aguadilla, 70 miles from San Juan, would take in emergency patients from the Arecibo area. Other Commonwealth mental health facilities were also to take responsibility for patients previously directed to the Hospital. Overcrowding would thus be eliminated, with care in other Commonwealth or private facilities provided both for many emergency and intensive care patients as well as for those patients needing residential facilities or family-care alternatives.[3]

---

1. Rafael Hernández Colón was governor at the time this suit commenced in 1974, but was replaced by Governor Carlos Romero Barceló in 1977. Governor Romero's tenure lasted until January of 1985 when a new administration led again by Governor Rafael Hernández Colón replaced him.

2. Eight hundred and ninety patients a month and an average of 10,704 a year would be treated at the Hospital, including PIC, Emergency Ward and Triage patients.

3. Defendants represent that, as a result of the successful operation of this plan, there is currently no overcrowding in the Río Piedras Psychiatric Hospital, that all the patients there have individual treatment plans, and that an adequate staffing pattern has been implemented. These criteria, according to the Master's own statements in his fourth preliminary report, are the most significant ones for determining compliance. Plaintiffs do not appear to deny that conditions at the Hospital are largely, if not entirely, in compliance with the stipulation.

After reviewing this proposal, the Master submitted the final version of his fourth report. The report recommended to the court that Plan 3 "be incorporated into the Court's Order." This report also suggested that the court take a number of actions with respect to "pre- and post-Hospital programs whose support is essential to the Hospital's compliance with the Court's consent order." These actions included requiring the Secretary to report on the budget of such institutions and charging "[t]he mental health system ... with responsibility for all patients who are neither acute or subacute." With respect to the Guerrero facility, the Master stated that "[s]ince its initial planning stage the Hospital has had a direct relationship with [Guerrero]," and therefore recommended that the court direct the defendants to set aside 144 beds in Module 7 of Guerrero for patients transferred from the Hospital.[4]

On August 5, 1987, the defendants filed exceptions and commentaries to the Master's fourth report. While noting that "[t]he class in the present action is composed of the patients of the Psychiatric Hospital and the institutions wherever they may be referred to in a descentralization [sic] program," the defendants asked that the court "maintain the scope of the class in the above captioned case and the stipulations agreed on by admitting from Plan 3 those portions that apply to the Psychiatric Hospital." The defendants now claim that, through this filing, they objected to the application of the stipulation beyond Río Piedras.

On August 10, 1987, in response to the Master's fourth report and the defendants' exceptions thereto, the court issued an order. As suggested by the Master, the order "incorporated" Plan 3, instructed the Secretary to report on the budgets for "the Hospital and the pre- and post-Hospital pro-

grams whose support is essential to the Hospital's compliance," and stated that the Commonwealth's mental health system would be "charged" with care and treatment of patients who were "neither acute or subacute." With respect to the issue of "jurisdiction," the court treated the defendants' exceptions and commentaries as an objection to its "jurisdiction" over the "network of pre- and post-Hospital services." In response to this objection, the court stated that it had no intention of concerning itself with matters not directly related to the Hospital's compliance with the stipulation. The court added, however, that "this translates principally into a concern that pre- and post-Hospital facilities be adequately funded. *There is also the related concern that patients transferred from the Hospital to transitional and psychiatric rehabilitation services receive care and treatment consistent with the 86 stipulations."* The defendants did not appeal from this order.

The transfer of 144 patients to Module 7 of Guerrero took place as ordered. This transfer appears to have been part of a large scale exodus of patients from Río Piedras. According to the Master's tenth report, during the eight months following the court's August 10, 1987 order, 904 patients left the Hospital. Of these, 343 were "transferred to the transitional services suited to their individual needs," and the balance apparently left the Puerto Rico mental health system.[5]

At the same time these transfers were occurring, the Master, with the consent of the defendants, conducted several visits to various facilities, including Guerrero, (the "tripartite visits") to assess the defendants' progress. The Master indicated that by April 27, 1988 overcrowding at the Río Piedras Emergency Ward had been eliminated and the PIC (Emergency) unit inau-

---

Whether or not this is so is a matter for the district court, subject to the rulings herein.

**4.** The basis for the Master's statement that the Hospital had "direct relationship" with Guerrero appears to be only that the Assistant Secretary for Mental Health had decided to set aside Module 7 of Guerrero, with 144 beds, for former Río Piedras patients. The Master did not find

that there was any direct administrative connection between the two facilities nor did he find any other relationship between them, apart from this reservation of beds in Guerrero.

**5.** It appears that 383 was the total number of patients transferred from Río Piedras to other facilities, and that the 144 transferred to Guerrero were included in this total.

gurated. On May 23, 1988, the Master submitted his sixth report to the court. The Master stated that the acute system of care was functioning in substantial compliance with the stipulation, and that the process of deinstitutionalization had continued at a good pace and was in its final phase. Notwithstanding these improvements, plaintiffs argued in 1988 that the tripartite visits had revealed that the transitional services offered at several facilities other than Río Piedras, including Guerrero, were in need of a strengthened program of occupational therapy. The Master, however, questioned his own authority to address that contention, stating:

> [t]hat the program of Transitional Services can be strengthened also is undoubtedly true, but in my opinion questions of that sort are not covered by the Consent Decree's ... stipulations and, therefore, it would be inappropriate for this report to make findings exceeding the limited standard of comparing the Hospital and post hospital conditions of the 343 transferred patients.

On June 28, 1988, the defendants submitted a motion claiming that the case should be closed because the government had substantially complied with the 1977 stipulation.[6] The court denied this motion on December 8, 1988, ruling that the Hospital was not in "full compliance."

On May 12, 1989, the Master submitted his eighth preliminary report covering the period of October 1988 to April 18, 1989. The report noted the problems faced by the Hospital in its effort to achieve full compliance. The Department of Health had not made available a sufficient number of transitional or post-hospitalization residential facilities. According to the report, the failure to provide sufficient units of transitional services was one of the principal causes for the Hospital's failure to achieve full compliance.

A number of meetings were then held between the parties and the Master to de-termine the substantive criteria and procedure to be followed in assessing whether full compliance had been achieved. Since no consensus was reached, each party submitted its own proposal to the Master. The Master, in his eighth preliminary report recommended to the court that an "interdisciplinary team," consisting of a psychiatrist, a social worker, a nurse, and an occupational therapist, be assembled to evaluate the substantive and procedural criteria for determining compliance. On April 15, 1989, the court issued an order appointing the members of the interdisciplinary team and providing for their compensation.

On June 12, 1989, plaintiffs submitted to the Master a "Motion Seeking Remedies," alleging that former Hospital patients transferred to Guerrero were not receiving adequate treatment. The motion alleged that there was overcrowding at Guerrero, that the facilities were unsanitary and more akin to a concentration camp than a therapeutic community. The Master's interdisciplinary team was instructed to visit Guerrero on June 19, 1989 and thereafter report to the court on its findings and recommendations regarding treatment at Guerrero. The interdisciplinary team subsequently reported that former Río Piedras patients at Guerrero lacked complete individualized treatment plans and were not receiving the benefits of an adequate psychiatric rehabilitation program. Several meetings were held between the Master and Commonwealth officials to discuss this report. The Commonwealth officials alleged that they faced problems in the recruitment and retaining of personnel due to the scarcity of professionals in the vicinity of Guerrero and the low government salaries.

The defendants then, in a September 6, 1989 letter, objected to the Court's "jurisdiction" over Guerrero. This objection was formally raised before the court in an October 20, 1989 motion. On December 28, 1989, the district court issued an opinion and order, addressing two questions. First

---

**6.** The Commonwealth's basis for this motion was the Master's judgment, expressed in his fifth report, that "with the pace and degree of the deinstitutionalization process only one conclu- sion is possible: as of November 13 [1987], the Secretary had more than fulfilled the commitments of Plan 3."

was "whether the court has jurisdiction over patients of the Río Piedras Psychiatric Hospital who have been transferred to the Therapeutic Community at Guerrero." Second was whether those patients had "received, or [were then receiving] adequate psychiatric rehabilitation services."

With respect to the first question, the court concluded that:

The Court's August 10, 1987 Order clarified that it had jurisdiction over Río Piedras Psychiatric Hospital patients transferred to Guerrero. In response to defendant's November 20, 1989 motion, the Court now reaffirms its jurisdiction over the latter patients.

This "jurisdiction" empowered the court to "secure compliance with the 86 stipulations in the Consent Decree, with the terms of the August 10, 1987 order, and all other pertinent orders issued by the Court." Although the court stated that this conclusion was consistent with the language of the stipulation, it did not engage in any detailed analysis of that language. Instead, it based its conclusion largely on Guerrero's role in relieving overcrowding at Río Piedras, the parties' actions subsequent to the drafting of the stipulation and its previous order of August 10, 1987. Thus the court stated that its conclusion was grounded on the Master's view that the Hospital "could only comply with the stipulations if it were conceived as an integral part of a system of mental health care which, besides the Hospital, necessarily included a network of pre- and post-hospital services." The court further stated that Plan 3, and the letter commitments of the Secretary concerning Guerrero, were proposed by the Secretary, at his initiative, accepted by the plaintiffs, adopted by the court and incorporated in the August 10, 1987 order. The court therefore held that, because of its August 10 order "incorporating" Plan 3, Plan 3 was

as much a binding legal obligation as the stipulated agreement once it was incorporated in the Consent Decree. The

Court's August 10, 1987 Order does not modify the stipulated agreements, as defendants claim, but rather represents an instrument proposed by the Secretary and accepted by the court. It also serves to clarify the scope of the court's jurisdiction, which in the case of Guerrero is explicitly included.

In addition, the court found that the defendants had manifested their consent to its "jurisdiction" by failing to object to several early reports of the Master concerning the reach of the stipulations, the tripartite visits, or the visits of the interdisciplinary team.

Having found that it had "jurisdiction" over former Río Piedras patients transferred to Guerrero, the court went on to address the plaintiffs' contention that those patients were not receiving adequate rehabilitation services. The court determined that those patients "were not receiving adequate psychiatric rehabilitation services on June 19, 1987 and for an indeterminate period of time prior to that date." However, the court was unable to determine whether those services had been adequate since September 6, 1989. Therefore, the court ordered the Master to develop "criteria for evaluating Guerrero's rehabilitation services ... based on the stipulations, the court's August 10, 1987 Order, and, as well, the concept of a therapeutic community as enunciated by the Mental Health Secretariat." The court postponed its decision to fine the defendants, as requested by the Master, to a later date.

On January 16, 1990, the defendants moved the court under Fed.R.Civ.P. 59(e)[7] to alter or amend the December 28, 1989 opinion and order. The defendants argued in their motion that the district court's "jurisdiction" could not extend beyond the scope of the stipulated agreement, that the stipulation was limited to conditions of confinement and treatment at the Río Piedras Psychiatric Hospital and, thus, that the court lacked "jurisdiction" over the network of pre- and post-hospitalization servic-

---

7. Fed.R.Civ.P. 59(e) reads

A motion to alter or amend the judgement shall be served no later than 10 days after

entry of the judgment.

es. The defendants also argued, for the first time since their answer to the complaint in 1975, that a class of plaintiffs had never been certified as required by Fed. R.Civ.P. 23(c)(1). Plaintiffs opposed the defendants' motion under Rule 59(e) and moved for sanctions under Fed.R.Civ.P. 11, stating that the defendants' motion under Rule 59(e) was frivolous.

On March 6, 1990, the district court issued another opinion and order reaffirming its "jurisdiction" over the network of pre- and post-hospitalization services and over former Hospital patients transferred to Guerrero for largely the same reasons as those set forth in its December 28 opinion and order. The court stated that "the stipulated agreement was never understood as limited to conditions and services exclusively within the Hospital," and that, even if the stipulation's application to Guerrero "is characterized as a modification, it was the [defendants'] doing in the first instance." The district court also rejected the defendants' assertion that it did not have "jurisdiction" over these facilities based on principles of federalism. It found the defendants' arguments "largely irrelevant."

In the March 6, 1990 opinion and order, the court also ruled that this action had been maintained as a class action since class certification was satisfied when the court approved the stipulated agreement in April of 1977. As to notice to the class members, the district court found that the provision under Rule 23 requiring notice existed essentially to permit individuals to request exclusion from the class, or to enter an appearance through their own counsel. Even if all the patients had been notified directly or through their respective guardians, the district court found it inconceivable that any of them would have asked to be excluded from the benefits mandated by the agreement. The record reflects, the court said, that in thirteen years no patient nor his respective guardian had come forth to complain that his rights under the stipulated agreement had in any way not been represented adequately by counsel for plaintiffs in the class action, nor had any member of the class sought to be represented by his or her own counsel. Finally, the court agreed with plaintiffs' view that the defendants' arguments were frivolous and, pursuant to Fed. R.Civ.P. 11 and 28 U.S.C. § 1927, assessed sanctions totaling $1,500 in attorney's fees against counsel for the defendants.[8]

It is from the March 6, 1990 order that the defendants appeal.

## I. CLASS ACTION

Defendants contend that the suit Navarro instituted below never became a class action because a class was never certified as required by Fed.R.Civ.P. 23(c)(1).[9] Defendants point out that the purported members of the class and their guardians were never notified of the proceedings in the case, either by counsel for plaintiff or by the court-appointed Master. Finally, defendants argue that "even though the parties entered into a stipulated agreement which the court approved, neither the stipulated agreement nor the court's judgment approving it describe the members of the class." Under defendants' view, only Navarro, the individual plaintiff, was a party to the stipulated agreement, limiting defendants' duties to providing to Navarro alone whatever services he was entitled to receive.

---

8. In April of 1990, after the defendants had filed the notice of appeal before this court, the district court requested that this court remand the issue of sanctions as it appeared from the record filed by the defendants. We remanded and on April 26, 1990 a hearing was held before the district court for reconsideration of the Rule 11 sanctions. In an order dated April 27, 1990, the district court vacated the Rule 11 and 28 U.S.C. § 1927 sanctions. The issue of sanctions is no longer part of this appeal.

9. Navarro's original complaint alleged that suit was brought on behalf of himself and "all allegedly mentally incapacitated persons now residents at the Psychiatric Hospital ... or that are receiving mental treatment in said hospital...." The class plaintiffs now contend exists is coextensive with the definition of resident of the hospital in the stipulated agreement, to wit, "all persons who are now patients and all persons who may in the future receive treatment or habilitation at such institution [viz. the Hospital]."

The district court rejected this narrow characterization of the action. In its March 6, 1990 opinion and order, it held that the class action nature of this suit was implicitly certified by the court when, in 1977, it entered a judgment in accordance with the terms of the consent decree. While conceding that the court did not at the time or thereafter notify the members of the class, the district judge stated that it "would not only be inequitable, it would be absurd" to declare, thirteen years after the stipulated agreement, that a class action had not been established.

The question of class certification here is not simple. *See generally Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 430, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599 (1976) (absent certification, where named plaintiffs lost their interest in the lawsuit, case would have become moot, *infra*). In important public interest litigation like this, we do not know how the parties and the original judge could have overlooked a key step like class certification. Nonetheless, we are persuaded that because this case was instituted by a complaint seeking class relief, implicitly granted class relief, and was conducted for years as a de facto class action, it should and may be recognized as such. We shall address defendants' contrary arguments.

### A. *Class Certification under Fed. R.Civ.P. 23(c)(1)*

■ It was an egregious omission for the district court not to have determined explicitly, as soon as practicable after this action commenced, whether it could be maintained as a class action and, if so, the proper description of the class. *See* Fed. R.Civ.P. 23(c)(1).[10] Certifying the class "as soon as practicable" under Rule 23(c)(1) is not a minor formality, but is necessary to give the action a clear definition. *See* Fed. R.Civ.P. 23(c)(1), advisory committee's notes to 1966 amendment. By focusing on the class issue early on, the district court identifies the plaintiffs, demarcates the

boundaries of the legal dispute and makes provision to protect absent class members. In so doing, of course, the district court may take advantage, to the extent appropriate, of the parties' own agreements and stipulations describing the nature of the suit and the existence of a class. *See Willie M. v. Hunt*, 657 F.2d 55 (4th Cir.1981).

■ While express class certification is a fundamental requirement, uncertified actions have on occasion been recognized as class actions. When the parties stipulate that the action is a class action and clearly define the members of the class, and the court enters judgment pursuant to the stipulated terms, this may sufficiently imply certification for purposes of Fed.R.Civ.P. 23(c)(1). *See Oburn v. Shapp*, 393 F.Supp. 561 (E.D.Pa.) (holding that where the action was filed as a class action and a consent decree was entered into, entry of the consent decree was sufficient certification of the action as a class action under Rule 23), *aff'd on other grounds*, 521 F.2d 142 (3d Cir.1975); *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 447 (5th Cir.1973) (where the plaintiff brought an action as a class action and the district court granted class relief, but neglected to certify the class, the district court nevertheless "implicitly determined that th[e] suit would be maintained as a class action").

While the Supreme Court has yet to rule directly on the issue of implied certification, the Court has suggested, in dicta, that parties may not be able to rely on implicit class certification. *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). In *Spangler*, several students of a public school system sued the school board and several of its officials, alleging unconstitutional segregation. After trial, the district court entered a judgment holding that the defendants' educational policies violated the Fourteenth Amendment, and, pursuant to the court's order, the defendants submitted a plan for systemwide relief. Four years later, the defendants moved to modi-

---

10. Fed.R.Civ.P. 23(c)(1) states:
    (1) As soon as practicable after the commencement of an action brought as a class

action, the court shall determine by order whether it is to be so maintained. . . .

fy the district court's order. This motion was denied on the merits by the district court, 375 F.Supp. 1304 (1975), whose decision was affirmed by the Ninth Circuit, 519 F.2d 430 (1975). Before considering the merits, however, the Supreme Court noted that, because the original plaintiffs had graduated and no class had ever been certified under Rule 23, the case would be moot had the United States not intervened. The Court thus rejected the plaintiffs' argument—raised, insofar as appears from the published opinions, for the first time in the Supreme Court—that "th[e] litigation was filed as a class action, that all the parties have until now treated it as a class action, and that the failure to obtain the class certification required under Rule 23 is merely the absence of a meaningless 'verbal recital.'" 427 U.S. at 430, 96 S.Ct. at 2702. The Court stated that "while counsel may wish to represent a class of unnamed individuals still attending the Pasadena public schools ... there has been no certification of any such class which is or was represented by a named party to this litigation. Except for the intervention of the United States, we think this case would clearly be moot." *Id.* (citations omitted).

█ Any expression by the Supreme Court, whether or not in dicta, must be taken seriously. Events here, however, come much closer than in *Spangler* to actual class certification. Unlike in *Spangler*, the parties have executed, and the court has approved, a written stipulation providing not only for class-wide relief but describing those who constitute the class. The named plaintiff, Navarro, sued expressly on behalf of himself and "all allegedly mentally incapacitated persons now residents at the Psychiatric Hospital ... or that are receiving treatment in said Hospital." The defendants, in their answer, denied, *inter alia*, that the suit was properly a class action. On April 8, 1975, the plaintiffs filed a memorandum of law containing detailed arguments in support of treating the case as a class action, but before the district court could rule on this motion, the parties submitted to the court on April 20, 1977 a stipulated agreement in resolution of the case. After reviewing the provisions of the stipulation, the court entered judgment on June 2, 1977 "in accordance with all the agreements made by the parties in said stipulation." One of the agreements so made by the parties was the stipulated definition of "residents" of the Hospital (for whose benefit the operative clauses of the consent decree were drafted) as "[a]ll persons who are now patients and all persons who may in the future receive treatment or habilitation at such institution."

Once the plaintiffs and defendants stipulated to these matters, and the court entered judgment in accordance with their written stipulation, the class nature of the suit was, in practical effect, "established." The remedies in the stipulation clearly went far beyond the individual needs of the named plaintiff. It was fashioned as an instrument for Hospital-wide change, affecting all patients at Río Piedras, not just one patient. Consistent with the stipulation, the sweeping hospital improvements later undertaken by the court, Master and parties were directed at benefiting the entire patient class, not simply at helping the named plaintiff. Had defendants or the court not believed this was a class action, they would hardly have taken the measures they did for thirteen years nor would defendants have failed to raise the issue until now.[11]

The stipulation, moreover, specifically describes the class members who are to benefit from the stipulated relief. *Supra.* No stipulated agreement or definition appeared in *Spangler*. Thus, the stipulation served the purpose of Rule 23—"to give clear definition to the action," Fed.R.Civ.P.

---

11. Indeed, the defendants have on at least two occasions subsequent to signing the 1977 stipulations described the plaintiffs as a class. *See* Commonwealth's "Post Trial Memorandum" dated September 28, 1978 (containing in its title the term for plaintiffs "Roberto Navarro Ayala, *et al.,* plaintiffs") (emphasis added); the Commonwealth's "Motion Submitting Defendant's Exceptions and Commentaries to the Master's Report Filed on July 22, 1987" ("Defendants respectfully reiterate their request to maintain the scope of the class ... by admitting those portions that apply to the Psychiatric Hospital").

23(c)(1) advisory committee's notes to 1966 amendment—even though it did not use the words "class" as such.

Another difference between this case and *Spangler* is that, in the proceeding from which this appeal was taken, the question of whether this was a class action was presented to the district court, which found that it was. The defendants had argued the contrary position to the court. The court concluded that, while the original judge had never expressly certified a class, a class had been intended and was defined in the stipulation, and that the court, the parties and the Master had continuously viewed and treated the case as a class action. Thus the court of appeals is not being asked to imply certification for the first time on appeal from whatever it can discern of the actions of the parties below, as in *Spangler*. Rather the matter of class certification comes to us, after adversarial presentation below, with the benefit of a district court finding. The situation is close to that where a district court certifies a class retroactively after judgment, having inadvertently failed to act earlier on a certification motion. *See Gurule v. Wilson*, 635 F.2d 782, 790 (10th Cir.1980); *Marshall v. Kirkland*, 602 F.2d 1282, 1301 (8th Cir.1979). Thus, notwithstanding the concerns *Spangler* raises, we think it proper to uphold the district court's ruling sustaining the class nature of this suit.[12] We hold that the action may proceed as a class action.

### B. *Notice to the Members of the Class*

Defendants also complain that neither the patients nor their guardians were given any notice regarding the proceedings in

this case, either by counsel for the plaintiff or by the court-appointed Master. Defendants appear to focus on Rule 23(e), but since Rule 23(d)(2) as well as Rule 23(e) refers to notice, we review the arguments under both.

Rule 23(d)(2)[13] indicates that notice is not mandatory, but *may* be required by the court.

"Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion. In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum...."

Fed.R.Civ.P. 23(d), advisory committee's notes to 1966 amendment. Hence, the notice contemplated under Rule 23(d)(2) is discretionary. *Penson v. Terminal Transport Co.*, 634 F.2d 989, 993 (5th Cir.1981); *United States v. Allegheny–Ludlum Industries, Inc.*, 517 F.2d 826, 878 n. 86 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Commentators have stated that adequate representation alone will comply with the due process demands of the rule, obviating constitutional need for notification of class certification. H. Newberg, *Newberg on Class Actions*, § 8.16 (2d ed. 1985). Thus, Rule 23(d)(2) did not require the district court to give notice of class certification to the patients or their guardians.

The language of Rule 23(e),[14] on the other hand, *directs* that notice be given to "all members of the class" before dismissal or compromise of a class action. Here, although the stipulation effectively compromised the case, the district court

---

**12.** Since *Spangler* was decided, the Fifth Circuit (which decided *Bing v. Roadway Express, supra* ), has continued to hold that a class action may proceed despite the district court's failure to certify a class where the "defendant[s] ... knew of the class nature of th[e] action and acquiesced in it." *Graves v. Walton County Board of Education*, 686 F.2d 1135, 1139 (5th Cir.1982).

**13.** Fed.R.Civ.P. 23(d) reads in relevant part

In the conduct of actions to which this rule applies, the court may make appropriate or-

ders: ... (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, ...

**14.** Fed.R.Civ.P. 23(e) reads

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

entered judgment under the stipulation without first giving notice to class members. But while Rule 23(e) directs the giving of notice, it leaves the form of the notice to the court's discretion; for this reason, courts have sometimes overlooked the absence of notice where there was clearly no prejudice to class members. *See, e.g., Larkin General Hospital, Ltd. v. American Tel. & Tel. Co.*, 93 F.R.D. 497, 502 (E.D.Pa.1982) (dismissal of class action without notice said to be without prejudice to class). More important, where a cohesive class is certified under Rule 23(b)(2), notice may suffice if given to a suitable class representative. *See Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 962 (3d Cir.1983). We think that Puerto Rico Legal Services, which was counsel for Navarro and the class, may be considered a suitable representative for notice purposes here, at least where, as found, there have never been complaints from putative class members. Counsel monitored and actively participated in the settlement, which has resulted in significant benefits to the patient class. Counsel obviously saw itself as representing the entire patient class at the Hospital, and not just the named plaintiff.

The lack of notice argument is particularly inappropriate coming, as it does, not from injured class members but from officials seeking to use the lack of notice as a basis for resisting the granting of relief to the plaintiff class. To uphold *defendants* for failure of notice to class members would be to wield the notice requirement as a sword against those it was meant to help.

We hold, in sum, that this suit is properly a class action brought in behalf of all persons who were patients when suit was brought and all persons who may in the future receive treatment or habilitation at the Psychiatric Hospital in Río Piedras.

## II. APPLICATION OF THE STIPULATION TO GUERRERO

The second issue is whether the district court correctly determined that the terms of the stipulation can be enforced in respect to former Hospital patients now residing at the Guerrero Therapeutic Community, a separate institution located in the city of Aguadilla, approximately 70 miles from the Hospital. The court ruled that the stipulation entered in 1977 applied to Guerrero in respect to the approximately 144 patients transferred there from Río Piedras. The court therefore concluded that it had "jurisdiction" over Guerrero, and that the Master should consider how the stipulation (although written chiefly in terms of the needs of Río Piedras) should be applied to the rehabilitation services offered at Guerrero.

We hold that neither the terms of the stipulation nor the subsequent actions of the parties make the stipulation applicable at Guerrero.

### A. Standard of Review

■ The present case was not resolved by judicial rulings and findings but by a court-approved stipulation.[15] Whether the remedial provisions of the stipulation, and the district court's oversight, extend to Guerrero are, therefore, matters of interpreting that stipulation. This, in turn, raises the question whether, on appeal, this court owes special deference to the district court's interpretation, over and above the deference we would normally give to a lower court's construction of a contract. We think not, as the institutional coverage of the stipulation goes to the very heart of the parties' original bargain.

We recognize that this court has said that district courts enforcing public law consent decrees have, in general, broad discretion in determining such matters as whether the objectives of the decree have been substantially achieved. *United States v. Commonwealth of Massachusetts*, 890 F.2d 507, 509 (1st Cir.1989). Unlike consent decrees entered into in commercial litigation, which are to be con-

---

**15.** The agreement in this case, which was entitled a "stipulation" by the parties, approved by the court, and upon which judgment was entered, was no different in legal effect from a consent decree. Thus we refer without distinction to precedent involving consent decrees.

strued throughout like a contract, *id.*, the interpretation of broad, programmatic decrees entered into in public law litigation will often warrant a more flexible approach. *AMF, Inc. v. Jewett,* 711 F.2d 1096, 1101 (1st Cir.1983). Thus, "in examining a decree issued in public law litigation ... the appellate court should recognize that broad 'judicial discretion may well be crucial' for the district judge to secure complex legal goals." *Massachusetts Association of Older Americans v. Commissioner of Public Welfare,* 803 F.2d 35, 38 (1st Cir.1986) (citations omitted).

In *Langton v. Johnston,* 928 F.2d 1206 (1st Cir.1991), we elaborated the rationale behind these two different standards for interpreting consent decrees:

> This double standard derives from the realities of human experience. Different types of consent decrees are ordinarily conceived and hatched in markedly different ways. In a commercial setting, a consent decree is treated like a contract because the court assumes that private parties understand the economic realities and business consequences of their agreements....

> In public law litigation, courts typically play a proactive role—a role which can have nearly endless permutations.... Frequently, the trial court's adjudicative function blends with its service as an instrument for change. The relief requested often involves the restructuring of a state or city program, requiring the court to fashion equitable remedies— sometimes unique and often complicated—in order to secure 'complex legal goals.' ... We agree with Professor Chayes that, in the public law context, the consent decree 'provides for a complex, ongoing regime of performance rather than a simple, one-shot, one-way transfer.... It prolongs and deepens, rather than terminates, the court's involvement with the dispute.' Chayes, *The Role of the Judge in Public Law*

*Litigation,* 89 Harv.L.Rev. 1281, 1298 (1976)....

*Id.* at 1221.

The above might at first glance appear to require deference to the judgment of the district court in this case as to the scope of coverage of the present stipulation. However, we see a critical distinction here based on the nature of the question. The rule of broad discretion in public interest cases is designed to give the district court flexibility in deciding exactly how the numerous conditions of a complex consent decree are to be implemented in practice. In overseeing broad institutional reform litigation, the district court becomes in many ways more like a manager or policy planner than a judge. Over time, the district court gains an intimate understanding of the workings of an institution and learns what specific changes are needed within that institution in order to achieve the goals of the consent decree. In *Commonwealth of Massachusetts,* for example, the district court needed considerable leeway to decide whether the Commonwealth's remedial plan for providing periodic evaluations of the patients was sufficiently specific. 890 F.2d at 509. In *Older Americans* the district court, in ruling on a contempt motion, needed discretion to decide whether a state's new policy for deciding whether to terminate AFDC benefits would suffer from the same deficiencies as the former termination policy which had given rise to the litigation. 803 F.2d at 39. And the *Langton* district court, also ruling on a contempt motion, required discretion to decide whether a treatment center had sufficiently implemented the educational, vocational, recreational and therapeutic programs required by a consent decree. 928 F.2d at 1211–17.[16]

However, the issue now presented differs markedly from the issues that were before the district courts in *Commonwealth of Massachusetts, Older Americans* and *Langton.* Here the issue is at what public institution or institutions the

---

16. *Jewett* was a trademark infringement case which merely discussed the standard for interpreting public law consent decrees by way of

contrast to the commercial law standard applicable to the case.

Commonwealth of Puerto Rico, in agreement with plaintiffs, consented to sponsor and finance sweeping remedial measures under the aegis of the federal court. The rationale for deferring to the decision of a district court, that its involvement with the ongoing case makes it best able to decide issues concerning institutional management and compliance, should not control an issue, like this one, which involves determining the scope of the parties' original bargain.[17] If this were not so, the making of a consent decree would, from the government's point of view, be a game of Russian roulette, since there could be no predicting the circumstances which might lead the judge, a decade or so later, to enlarge the areas of his own control. Ordinary contract principles, involving determination of the parties' intent when they entered into the stipulation, are the appropriate interpretative guideposts here.

Especially is this so given that the reach of the stipulation brings along with it the oversight jurisdiction of the federal courts. Principles of federalism weigh against a rule of district court deference which could result in enlarging federal jurisdiction beyond the parties' original understanding. One of the contracting parties here was, in effect, the Commonwealth of Puerto Rico, which now strenuously objects to the district court's interpretation. Especially where there has been no trial finding of unconstitutionality at any institution, the stipulation must limn the proper boundaries of the federal writ and must be scrupulously honored.[18] The Supreme Court has emphasized that "although the 'remedial powers of an equity court must be adequate to the task, ... they are not unlimited,' *Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971). One of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins*, 495 U.S. 33, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990). In enforcing a consent decree, a district court must remain "aware of ... the need to strike a proper balance between the integrity of the Consent Decree and the principles of federalism." *Duran v. Elrod*, 713 F.2d 292, 297 (7th Cir.), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1983). Here, our concern for principles of federalism is at its highest because we are dealing not with the details of implementing a clearly applicable consent decree, but with the question of whether the consenting parties, including officials of the Commonwealth of Puerto Rico, ever understood that the relief set out would apply at another, unmentioned institution. The issue is not, as in other cases, whether the defendants have conceded to the court authority to implement a particular policy in an institution already surrendered to the general authority of the court. Rather, the issue concerns a much greater threat to the Commonwealth's sovereignty, whether it has

---

17. To be sure, a district judge's knowledge about the working realities of Puerto Rico's mental health system may be useful background in construing the stipulation and determining its coverage. But deciding what the parties' meant by their writing in 1977 necessitates a more disciplined and traditional inquiry than does ascertaining whether the current efforts of officials were sufficient to meet broad programmatic goals. Wide deference to the district court's judgment is appropriate to the latter decision but not to the former. Parties to a consent decree are entitled to know that their negotiated choices will be respected—that a consent decree will not be treated as a mere entering wedge which, once entered, gives a district court untrammeled discretion to increase the number of public entities it supervises.

We do *not* suggest that a district court's special knowledge concerning the parties' inten-

tions when entering into a consent decree might not, in a proper case, provide material guidance about the decree's meaning. There is no issue of that sort here, however. The present district judge was not involved in the parties' negotiations in 1977 and makes no representations of possessing special knowledge about what transpired then.

18. The stipulation was substituted for defendants' right to an adjudication of unconstitutional conduct before being compelled to remedy conditions at a particular institution. If the Commonwealth defendants did not agree therein to remedy conditions at Guerrero, to force Guerrero to operate under federal court control now amounts to imposing unagreed upon federal sanctions without any adjudication of liability in respect to Guerrero.

voluntarily surrendered to the federal court its authority over the institution at all.

We conclude that the question of the district court's power over Guerrero is an issue to be decided under ordinary contract rules. Appellate review of contract interpretation is ordinarily plenary, *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1981). We, therefore, proceed carefully to scrutinize the stipulation and the actions of the parties to determine whether the stipulation applies at Guerrero.

### B. *What the Stipulation Originally Provided*

The stipulation defines the term "institution" as "[t]he Commonwealth of Puerto Rico Psychiatric Hospital as presently constituted or in Decentralized form" and then goes on to specify 86 conditions that must be met at the "institution." The question is whether this definition of the term "institution" includes Guerrero.

It is clear that neither in 1977 nor at any later time was Guerrero the "... Hospital as presently constituted." Can it be viewed as having become the "... Hospital ... in Decentralized form?"

The plaintiffs suggest that when the definition of "institution" was drafted in 1977, the parties had in mind the "decentralizing" of Río Piedras Hospital by transferring some of its emergency and other outpatient services to other facilities, placing some of its existing patients elsewhere, and diverting others who might become new patients. Plaintiffs go on to urge that such actions would cause the Hospital in

"decentralized form" to become, besides Río Piedras itself, any and all pre- and post-Hospital facilities within Puerto Rico serving or receiving patients who would formerly have been served by the Hospital or might have stayed there. Thus, Guerrero, which particularly (but by no means exclusively) came to serve a "post-Hospital" or "transitional" function, thereby relieving demands on Río Piedras, is said to have become, functionally, a "decentralized form" of Río Piedras Psychiatric Hospital, and hence subject to all the relief imposed by the stipulation upon that institution.[19]

We have fundamental difficulty with this reasoning. First, we do not think that a distant mental health facility, distinct from the Hospital, and with no administrative connection therewith, would normally be considered the "... Hospital ... in Decentralized form." There is no evidence of any special relationship between the Hospital and Guerrero other than an arrangement, tendered initially by defendants and now enforced by the court, that it would provide 144 places to accommodate Hospital overflow. If the mere receipt of patients from the Hospital, or otherwise destined for the Hospital, is sufficient to transform an institution into "[t]he Commonwealth of Puerto Rico Psychiatric Hospital ... in Decentralized form," then every other public facility receiving one or more such patients becomes theoretically subject to the 86 reform standards set out in the stipulation, or, at least, to a visit from the Master to determine how much of the stipulation it is possible to apply there. Such a construction would cause the tail to wag

---

**19.** The Master and district court never, in so many words, stated that Guerrero was a decentralized form of the Hospital. They did, however, emphasize the essential role of pre- and post-Hospital "transitional" institutions in relieving the Hospital's overload, and thereby enabling the stipulated reforms to proceed at the Hospital. Guerrero was noted as a facility which could, in particular, provide 144 beds for former Hospital patients. (There are figures indicating that this number was slightly under half of the Hospital's "transitional" patients at a given time, the rest being sent elsewhere.) The court fought successfully to force the defendants to honor their offer to provide 144 spaces at Guerrero to relieve overcrowding at the Hos-

pital. We do not question the district court's authority to identify such spaces, and require the Commonwealth to accommodate the Hospital's overflow, as part of its power to implement the stipulation meaningfully. *See Inmates of Suffolk County Jail v. Eisenstadt*, 494 F.2d 1196 (1st Cir.1974) (in enforcing consent decree requiring only one pretrial detainee per jail cell, district court could order some detainees transferred to a separate institution). The question here is not the court's power to force the Commonwealth to relocate excess Hospital patients and, if need be, to identify receiving institutions, but its power, having done so, to exercise oversight over the care and conditions at such other facilities.

the dog. As we discuss below, most of the stipulation was drafted rather obviously for application at the Hospital. Any such construction as we have mentioned would result in placing the federal court in essentially standardless control of many of the mental health institutions around Puerto Rico, simply because of the presence there of one or more former Río Piedras patients.[20]

A further reason to doubt this unnatural reading of the stipulation is that it far exceeds the relief sought by the plaintiffs in their complaint. The chief evidence of what plaintiffs were seeking when they agreed to the stipulation lies in the complaint, in which plaintiffs outlined the relief sought in their lawsuit. The complaint speaks of overcrowding, understaffing, poor living conditions, and inadequate care and treatment of patients at *"the Commonwealth of Puerto Rico Psychiatric Hospital"* (i.e., what we also call the "Hospital" or "Río Piedras"). In its prayers, the complaint seeks declaratory and injunctive relief at (specifically and repeatedly) *the Psychiatric Hospital* alone. Far from mentioning the treatment of patients outside the Hospital, or the treatment of removed Hospital patients at other places, it seeks an injunction against further admission of patients to the Psychiatric Hospital until conditions there are improved. There is no reference whatever to decentralized facilities or decentralization in the complaint. The complaint makes clear that the sole object of the lawsuit is to improve conditions at the Psychiatric Hospital. It seems reasonable, therefore, to assume that this, too, was the object of the stipulation entered into by way of settlement of that suit. If so, we think the term "... Hospital ... in Decentralized form" deserves a less ambitious reading than is now urged. The parties might simply have meant a reconstituted Hospital composed of separate administratively linked components. Or they may have thought that several quasi-independent facilities would operate bearing the original name of the Psychiatric Hospital. The fact is, no one knows. Lacking any further explanation of what was meant, we do not believe that this curious and totally unclear terminology can now bear the burden of including facilities around Puerto Rico whose only link with the Hospital is the receipt or diversion of some of its former or would-be patients.

The substantive provisions of the stipulation likewise offer little support for the proposition that it was meant to apply beyond the Hospital proper. To the contrary, the stipulation bears overwhelming evidence that the standards therein were drafted to apply at the Hospital—understandably, since conditions at the Hospital

---

20. We have held that "it is fundamental that for a contract to be enforceable it must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." *Soar v. National Football League Players Ass'n*, 550 F.2d 1287, 1289–90 (1st Cir.1977). The reasoning behind this principle is that a contract is an agreement between two parties, and a court should not require one of them to do something unless it can be reasonably certain that the party agreed to do it. *See* Corbin on Contracts § 95 (3d Ed.1963).

We think that this principle should guide our interpretation of the agreement in this case. Were we to hold that Guerrero, whose only connection to Río Piedras is that 144 patients have been transferred to Module 7, is a "decentralized form" of Río Piedras, we would be left with an agreement the requirements of which would be extremely difficult to determine. First, it would have to be determined what other institutions, besides Guerrrero, were also covered. Would all public institutions receiving former Río Piedras patients be subject to the stipulation? What about private contract facilities and foster homes receiving such former patients? What about facilities treating patients who, formerly, would have gone to Río Piedras? All such places would fit within the concept of pre- and post Hospital facilities. Second, what programs and spaces at such institutions and facilities would be subject to the stipulation? If, say, three former Río Piedras patients were at a facility housing 100 other patients, would the court's jurisdiction extend to the entire place or just to programs and spaces affecting the three transferees? If the latter, how could such a separation be effected, practically? Third, it would be unclear which parts of the stipulation applied to those other facilities, programs and parts thereof. Some provisions do not appear capable of application anywhere but at Río Piedras, and the court would be left to decide how to modify the stipulations to apply them to other facilities.

were the sole target of plaintiffs' complaint.

First, several of the stipulation's provisions equate the "institution"—the entity to which the stipulation applies—with Río Piedras. In section "B–III", describing habilitation plans, the stipulation states that

The Mental Health Centers which refer patients to the *San Juan Psychiatric Hospital* shall make a preliminary evaluation of the mental condition of such patient. Each patient who is referred to the *institution* must be preliminarily evaluated by the Emergency Room Physician prior to admission to determine whether he should be admitted.

In this passage the parties appear to have used "San Juan Psychiatric Hospital" and "institution" interchangeably. If the term "institution" were not synonymous with Río Piedras, then these two sentences would refer to two different entities, which, in context, would not make sense.

Likewise, Section "B–IV" contains a detailed description of the Río Piedras facility, discussing the number of wards there and the number of patients, showers and toilets in each ward. It then goes on to state that "[u]ntil such time as the physical facilities at the *institution* can be habilitated to provide in each ward multi-resident rooms of no more than 10 patients, and one toilet, lavatory, and shower for every 10 patients, the following physical improvements shall be provided...." (emphasis added). By following the description of deficiencies at Río Piedras with a specific proposal for improving conditions at the "institution," this paragraph, like that discussed above, equates the term "institution" with the Río Piedras Hospital alone.

Not only does the stipulation equate the "institution" with Río Piedras in two places, several of its substantive provisions underscore the intention to apply to Río Piedras. For example, as noted above, the stipulation contains a detailed description of the existing physical facilities at Río Piedras immediately preceding the list of physical standards to be observed prospectively. This indicates that the physical standards (and, by implication, the rest of

the standards) were thought of as applying to Río Piedras. Even assuming the standards are general enough to apply to any facility, the drafter would not likely have preceded these general standards with a detailed description of Río Piedras if he had intended the standards to apply anywhere but at Río Piedras. Moreover, this physical description of Río Piedras cannot be viewed as some sort of boilerplate language merely intended to introduce a set of general physical standards. The stipulation is divided into two overall parts, part "A," containing an introductory description of conditions then existing at Río Piedras, and part "B," containing a list of standards to be observed in the future. Thus, if the physical description of Río Piedras were merely boilerplate, one would expect it to appear somewhere in part "A," not immediately preceding the operative physical standards in part "B."

Another part of Section "B–IV" makes specific reference to two other facilities, Cayey and Bayamón, mandating that 200 patients be moved from Río Piedras to those named facilities. Yet the stipulation does not state that its standards are to apply to those facilities. If it were the intent of the parties that Cayey and Bayamón be regarded as part of a decentralized Río Piedras, and hence subject to the stipulation, surely a draftsman would have made this point more clearly than by the single use of the term "decentralized form" in the definitional section. Indeed, this would have been the logical place in the agreement to clarify the requirements applicable to an institution such as Guerrero. The total lack of mention of this concept in reference to Cayey and Bayamón seriously undercuts the plaintiffs' current arguments on this score.

In addition to these particular provisions, the entire structure of the stipulation indicates that it is aimed specifically at the Río Piedras Hospital. The stipulation is divided by two headings: "A. *FACT SITUATION*" and "B. *STANDARDS TO BE OBSERVED AT THE **PSYCHIATRIC HOSPITAL** AND TIME SCHEDULE FOR COMPLIANCE*" (boldface added). The defini-

tion of "institution" and the entire list of standards are contained under heading "B," whose title indicates that the definition and standards are to apply only to the "Psychiatric Hospital," i.e., Río Piedras. As one of two organizational headings, and the heading which preceded all of the specific stipulations, heading "B" was a fairly important piece of language. If the drafter had been concentrating on producing a document designed to cover other facilities, he would likely have used a term such as "Standards to be Observed at all Covered Facilities," or something to that effect. That the stipulations begin with the term "Standards to be Observed at the Psychiatric Hospital ..." indicates that the drafter was concerned with the existing Río Piedras facility or, at least, some later aggregate of facilities constituting a recognizable successor to the current Hospital.

We conclude, therefore, that the stipulation, as drafted, did not encompass Guerrero. While Guerrero and many other institutions have taken overflow from the Hospital, they have not, in any meaningful sense, become its operational components. They are not now the "Commonwealth of Puerto Rico Psychiatric Hospital ... in Decentralized form." This is not to question the right of the court to require the Commonwealth to accept Hospital patients at other facilities, as part of the necessary plan to bring the Hospital in conformity with the stipulation. A district court has extensive equitable powers to enforce stipulated goals. But neither the stipulation nor the court's authority extends to the conditions at such places in the absence of further agreement or another lawsuit establishing the existence of unconstitutional conditions at these separate institutions. State officials entering into a consent decree are entitled to rely on courts to apply the decree only to its agreed objects. Consent decrees are not like the camel's proverbial nose in the tent, which, once inserted, gives the animal free rein to come and go at will. The improvement of mental health facilities will not be advanced by giving state officials reason to avoid entering into such arrangements in the future for fear they will be expanded beyond their language.

## C. Construction of the Stipulation in Light of the Parties' Actions

■ Having decided that the stipulated agreement as drafted in 1977 did not, by its terms, apply to Guerrero, we next consider whether it now applies to Guerrero because of the actions taken by the parties to implement the agreement. An argument that the actions of the parties make the stipulation applicable to Guerrero may be constructed in a number of different ways. First, in the view of the district court, the defendants' actions gave rise to an equitable estoppel, so that they were estopped to deny that the stipulations applied to Guerrero. Second, the district court also held that "norms of judicial·responsibility" dictated the same result, which might be thought of as an application of the doctrine of judicial estoppel. *See United States v. Levasseur*, 846 F.2d 786, 792 (1st Cir.1988). Third, our dissenting colleague argues that the defendants' actions may be used as extrinsic evidence to indicate that the defendants, in drafting the original agreement, intended that it would apply to facilities such as Guerrero.[21]

■ All three of these arguments hinge upon the proposition that the defendants, through their actions, have represented that the stipulations would apply to Guerrero. Equitable estoppel contains a representation element, *see Phelps v. Fed-*

---

**21.** We agree with the dissent that ordinary contract principles should be used to interpret the terms of the stipulation. We also agree that one such principle is that evidence extrinsic to the decree may be used to determine the meaning of the stipulation. We entirely disagree, however, with the dissent's understanding and description of the extrinsic evidence in this case. The only record evidence of relevant events and documents existing at the time the stipulation was drafted is the complaint, which strongly suggests that the parties were concerned solely with reforming Río Piedras. See supra, p. 1341. And while our brother evidently believes otherwise, we are at a loss to see how defendants' actions since the drafting of the stipulation indicate that they intended the stipulations to apply to Guerrero. See infra, pp. 1343–1346. We believe that the record simply fails to provide support for this interpretation.

*eral Emergency Management Agency,* 785 F.2d 13 (1st Cir.1986). Judicial estoppel requires inconsistency between a position taken earlier before a court and a later one (the earlier position here would be the defendants' purported representation that the agreement applied to Guerrero). *See generally Levasseur,* 846 F.2d at 792. The extrinsic evidence argument supposes that the defendants revealed their actual intent at the time they entered into the stipulation through subsequent conduct in carrying it out. We reject all three approaches because we do not construe the defendants' subsequent actions as clearly representing that the stipulations applied at Guerrero.

To be sure, the defendants have taken numerous actions aimed at using the Guerrero facility, as well as others, to help alleviate overcrowded conditions at Río Piedras. They have done so at the court's urging, and, as we have said, we believe the court properly exerted pressure upon defendants to provide facilities to reduce overcrowding at the Hospital. *See Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196 (1st Cir.1974). The mere transfer of patients to Guerrero and elsewhere, however, did not constitute a representation by defendants that they agreed to operate Guerrero in conformity with the 86 conditions set forth in the stipulation. Nor did defendants' suggestions that the quality of care provided at these places would be high amount to any such representation.

Plaintiffs contend that before the adoption of Plan 3, defendants did not object to, and supposedly by their silence acquiesced in, certain statements by the Master relating to the need for improvements at institutions other than Río Piedras.[22] Then, in 1987 the defendants submitted Plan 3, which called for the transfer of some patients at Río Piedras to Guerrero and other facilities. These and similar actions undoubtedly evidenced a willingness on the part of the defendants to use Guerrero to help relieve pressures on Río Piedras. But they fell far short of representing agreement that the terms of the stipulation applied henceforth at Guerrero.

It is true that after submitting Plan 3, the defendants, on August 5, 1987, submitted "exceptions and commentaries" to the Master's fourth report, parts of which may be read as assuming the stipulations will apply beyond Río Piedras. The exceptions and commentaries state that

> Said plan [Plan 3] includes a description of the Mental Health Program of the Commonwealth of Puerto Rico to illustrate this Honorable Court and the Master as to the scope of the program. The Psychiatric Hospital of Río Piedras is only a part of said program and is the institution under the stipulations before this Honorable Court, with whatever facilities may be used to descentralize [sic] the care of said hospital's patients. As before stated the individuals that come in contact with the primary units of the mental health program are not patients of the Psychiatric Hospital and most of the time do not become so. The class in the present action is composed of the patients of the Psychiatric Hospital and the institutions wherever they may be referred to in a descentralization [sic] program. Defendants respectfully reiterate their request to maintain the scope of the class in the above captioned case and the stipulations agreed on by admitting from Plan # 3 those portions that apply to the Psychiatric Hospital.

We find it difficult to discern any precise meaning from this language. Even if the reference to "whatever facilities may be used to descentralize [sic] the care of said hospital's patients" may be viewed as acknowledging that Guerrero is "under" the stipulations, that language is contradicted by the apparent attempt to limit the court's authority to Río Piedras by asking it to "admit [ ] from Plan # 3 those portions that apply to the psychiatric hospital." Moreover, throughout the course of this litiga-

---

22. Typical of such statement was the Master's statement in his report covering the period from August 1985 to April 1986 that "appreciable reform during fiscal 1986–87 cannot be anticipat-ed unless adequate funding is provided, not just for the Hospital, but also for the entire network of mental health services on which the effectiveness of the Hospital ... depends."

tion, the defendants' "exceptions and commentaries" have been treated as an objection to the court's "jurisdiction" over Guerrero. The district court responded to the motion by issuing an order referring to the defendants "objection" to the scope of its "jurisdiction" and attempting to clarify that jurisdiction. Moreover, the district court's December 28, 1989 order states that its August 10, 1987 order was necessary "because defendants' … motion, taking exceptions to the Master's fourth report, requested the court to restrict the scope of the stipulations to the physical premises of the hospital and to the patients residing there." We therefore decline to treat this motion as a representation by the defendants that the stipulation would apply to Guerrero.

Nor can the defendants' failure to appeal from the court's August 10, 1987 opinion and order, issued in response to the "exceptions and commentaries," be treated as such a representation. The court stated in that opinion and order that it intended to see that patients transferred to Guerrero received treatment consistent with the stipulation. Defendants' failure to appeal from this order did not, however evidence acquiescence that the stipulation applied at Guerrero.[23] The August 10 order did not require the defendants to *do* anything other than what they had been doing all along—use Guerrero to house patients transferred from Río Piedras. The order required defendants to set aside 144 beds

in Guerrero for former Río Piedras patients, submit certain budgetary information and take several specific actions at Río Piedras. Compliance with these directives said nothing about defendants' willingness to conform the internal management of Guerrero with the stipulation. It was not until December 28, 1989 that the court issued an order requiring defendants to take a particular action with regard to their internal management of Guerrero in supposed compliance with the terms of the stipulation. When the court issued this order, defendants promptly objected, resulting in the present appeal.

Finally, like their previous actions, the defendants' participation in the "tripartite visits" and the "interdisciplinary visits" to Guerrero and their submission of a report on the status of patients transferred to Guerrero cannot be construed as tantamount to a representation that the stipulation applied to Guerrero. In the words of the Master, the "tripartite visits" were undertaken for the limited purpose of "evaluat[ing] if transferred patients were better off than if they had remained in the hospital." An agreement to determine whether the patients were better off in Guerrero does not evidence an agreement that their treatment was regulated by the 86 stipulations. Indeed, when the "interdisciplinary group" reported that patients transferred from Río Piedras to Guerrero were receiving inadequate rehabilitative care, the de-

---

23. Although neither party raises the issue, we have also considered whether the August 10, 1987 order could be considered res judicata. We held in *Morgan v. Nucci*, 831 F.2d 313 (1st Cir.1987), that reconsideration of a district court's injunction in an ongoing institutional reform case can be barred on appeal by the doctrines of issue preclusion or "law of the case." However, that case involved an appeal from a district court's order reinstating an earlier order which had itself been affirmed on appeal to this court. Where no appeal is taken and decided, the unappealed order is ordinarily nonpreclusive.

We think such a result follows from the need, in a complex, ongoing case of this nature, that the district court retain flexibility to modify its orders to deal with changing circumstances. Thus, where a higher court has not considered and upheld an interlocutory order, a district court should generally be free to reconsider that

order. As one authority has noted, "[t]he fact that appeal might have been taken from various intermediate orders under an interlocutory appeal statute or an expanded version of the final judgment rule should not preclude reconsideration by the trial court or review on appeal from a traditional final judgment." 18 C. Wright, A. Miller and E. Cooper *Federal Practice and Procedure* § 4433 (1981). In this case, the district court did in fact reconsider its August 10 order on the merits in both the December 28, 1989 opinion and order and the March 6, 1990 opinion and order, although it ended up concluding that the first order was correct. To hold that the August 10 order was res judicata would mean that the district court had erred in reconsidering its earlier order on the merits. This result would deny to the district court the flexibility it thought necessary to at least consider the modification of its earlier interlocutory orders. Thus, the August 10 order was not res judicata.

fendants, in a letter of September 6, 1989, raised their objections to the decree's application to Guerrero. This letter began the series of motions and court orders which culminated in the court's opinion and order of March 6, 1990, now on appeal.

We do not find, therefore, that defendants ever acknowledged that the remedial requirements of the stipulation were applicable at Guerrero. Instead, defendants' actions seem simply to have reflected the view that they were obligated to improve Río Piedras by reducing overcrowding there, and should do so in a generally cooperative and progressive manner.[24] The Master noted in 1987 that the current administration (which took office in 1985) had considerably increased the Puerto Rican mental health budget and that, for the first time, a genuine mental health system was taking shape in Puerto Rico. The district court's order of March 6, 1990 (affirming its December 28, 1989 order) went far beyond any previous order. For the first time, the district court, instead of ordering the defendants to move patients from Río Piedras to Guerrero or to determine whether such patients were better off at Guerrero, has ordered defendants to operate Guerrero's rehabilitation program under its supervision. The court, moreover, made clear that it was asserting full jurisdiction over conditions at Guerrero. To hold that the defendants are now bound to run the Guerrero facility under court supervision merely because they earlier made improvements there and accepted patients from Río

Piedras would be to punish them for their cooperation.[25]

Thus, while we believe that the district judge and the court-appointed Master have done an outstanding job performing the role of policy planners and managers to see that the complex legal goals inherently part of this litigation come about, a direct intervention to regulate the operation of the Guerrero facility was neither included in the terms of the stipulation nor made appropriate by the subsequent endorsement of the parties. As such intervention is not authorized, it must terminate.

■ In so holding, we do not deny that the district court has broad remedial powers to effectuate the provisions of the stipulation. *See generally Morgan v. McDonough*, 548 F.2d 28, 31 (1st Cir.1977) (district court's "equity power is broad and flexible and the propriety of an order turns on a balancing of individual and collective interests in the particular case"). For example, if former members of the plaintiff class now resident at Guerrero still lack the individual habilitation plans required by Section B–III(8)(c) of the stipulation because such plans were denied them when they were patients at the Hospital, the court even now could act to correct and remedy that earlier violation of the stipulation by ordering that the omitted plans be provided. In so doing, the court could not oversee current care and treatment at Guerrero, but would be entitled to order the pa-

**24.** In institutional litigation, assertions by the court and its agents, as well as the parties, must often be understood as part of an extended negotiating process: statements are not always made for their literal truth but to encourage or cajole. By the same token, silence in the face of what may appear to be overclaiming by the court may seem to be prudent policy where matters generally are proceeding satisfactorily. Defendants should not have to fear that their willingness to cooperate to a degree greater than required by a consent decree will later be taken as proof that they agreed to more than the decree provides on its face.

**25.** With respect to the equitable estoppel argument, the plaintiffs have not demonstrated that they relied upon any purported representations to their detriment. There is no showing that the patients at Guerrero would have been better off

had they remained at the Río Piedras facility in its overcrowded state. There is, indeed, no showing that the plaintiffs "agreed" to remove to Guerrero in reliance on some misrepresentation that their treatment there would be governed by the stipulation. In fact, as there is no indication they had any choice about moving, any "misrepresentation" could not "change [their] position for the worse," *Heckler v. Community Health Services of Crawford County*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984) (footnote omitted). Absent a second constitutional suit at Guerrero, this court cannot second guess the means chosen to improve the Río Piedras facility by asking whether, if the defendants had adopted some other plan for alleviating overcrowding at Río Piedras, patients who were transferred to Guerrero would have been better off than they are now.

tient to be given the individual evaluation and diagnosis that he or she should have been given while still at the Hospital. And, as previously noted, the court may direct that outside facilities be used temporarily or permanently to house patients and/or to offer services not provided by the Hospital if this is the only way to ensure compliance at the Hospital itself with the stipulation. However, the district court may not, as a general matter, regulate the rehabilitation programs offered at Guerrero, or require that institution to comply generally with the stipulated agreement. An ongoing oversight of the rehabilitation services or other treatment received by former Río Piedras patients at Guerrero is outside both the terms of the stipulation and any general remedial power that can be implied therefrom. To the extent inmates of institutions other than the Hospital (whether or not formerly patients at Río Piedras) believe that they are now being forced to endure unconstitutional conditions, they must bring another lawsuit making such allegations and seeking relief appropriate in their situation.

## CONCLUSION

To summarize, we find, first, that this suit is properly a class action. Second, we hold that the district court may not impose the terms of the stipulation on, or regulate, the Guerrero facility.[26]

*The opinion and order of March 6, 1990 is affirmed in part and reversed in part. Orders of the district court inconsistent with this opinion are vacated, and the case shall proceed in the district court in a manner consistent with this opinion.*

CYR, Circuit Judge (concurring, in part; dissenting, in part).

I concur in Part I of the opinion, but respectfully dissent from the conclusion reached in Part II. The majority opinion concludes that the consent decree definition of "institution" is too vague or ambiguous to permit the interpretation given it by the district court. The majority seems most concerned that appropriate respect for the integrity of Commonwealth governmental institutions and the principles of federalism would be disserved by the district court's interpretation of its jurisdiction under the consent decree. Although federalism concerns and the integrity of Commonwealth governmental institutions merit earnest consideration, the threat perceived by the majority is exaggerated.

The district court, plainly mindful of the attendant implications,[27] fairly interpreted the negotiated consent decree, employing entirely appropriate interpretive standards, and reasonably concluded that the language of the decree and the long-term course of performance by the parties evince an intention on the part of the Commonwealth to undertake a broad-based legal obligation from which it never dissented until the district court proceedings were about to be closed. The language of the consent decree, and the well-informed findings of the district court regarding the parties' post-decree course of compliance with the decree, demonstrate that the Commonwealth *intended*, at the time the decree was approved *in 1977*, to submit to the jurisdiction of the United States District Court all collateral mental health facilities involved in the contemplated decentralization of mental health services previously provided at Rio Piedras. The majority's analysis, on the other hand, seems rooted in its concern that the district court may have loosed itself from the jurisdictional constraints imposed by the language of the consent decree, armed with its own charter to *regulate all public mental health facilities and patients* in the Commonwealth. While there can be no doubt that such an arrogation of power would warrant firm remediation, neither the district court

---

**26.** The plaintiffs move for sanctions under Fed. R.App.P. 38. As we reverse the district court's decision concerning the applicability of the consent decree and find the defendants to have raised a legitimate argument concerning class certification and notice, we do not consider the appeal to have been "frivolous." The motion is therefore denied.

**27.** The district court devoted twelve pages of its forty-nine page opinion to a reasoned discussion of the Commonwealth's federalism claims.

nor the plaintiffs have interpreted the consent decree to confer any such unlimited or ambiguous jurisdictional license as the majority suggests.

The majority proceeds on the doubtful assumption that the decentralization provision operated *ab initio* as an unmitigated *burden* on the Commonwealth.[28] On the contrary, the Commonwealth gained the benefits of flexibility, affording it the option either to upgrade facilities at Rio Piedras to accommodate its initial patient population, or to convert Rio Piedras to a downscaled facility through periodic patient transfers to alternate sites of *its own choosing.* Under the majority's view, the Commonwealth would have been faced with a new lawsuit, with all its attendant litigational burdens, as to each different collateral facility to which a member of the plaintiff class was transferred. The consent decree, on the other hand, contemplated *from its inception* that certain as-yet *unidentifiable* patient services then being provided at the overcrowded Rio Piedras facility might no longer be offered at those premises by the time the litigation was brought to a conclusion. At the present time, Rio Piedras apparently is in compliance with the stipulations in the consent decree. Compliance was achieved, however, *as understood and agreed by all concerned,* only through the transfer of numerous former Rio Piedras patients to various collateral support facilities, such as the 144-bed module at Guerrero—the facility at issue on appeal. Furthermore, no other Puerto Rico mental health facility will be brought under the jurisdiction of the court in the future. Rio Piedras *and its support facilities* now constitute the fixed-size, decentralized form of the Hospital, and the plaintiff class includes only present and future residents of the "institution" as it is *presently composed.* As the district court itself noted, "persons treated in their community mental health centers who have never been patients of the Hospital, do not fall under the court's jurisdiction."

Under the explicit language of the consent decree, the plaintiff class is comprised of present and future "residents" of the "institution." The jurisdiction of the district court consequently extended to Rio Piedras and all collateral facilities utilized to depopulate and decentralize Rio Piedras in order to bring it into compliance with the minimum physical standards prescribed by the consent decree. The restrictive interpretation advanced by the majority is dependent entirely on the unrealistic assumption that a significant subset of the plaintiff class, namely all patients transferred *from* Rio Piedras, accepted a consent decree requiring improvements at Rio Piedras but imposing *no obligation* on the Commonwealth regarding the quality of care available at the collateral facilities to which those same patients were to be transferred. Viewed in its litigation context, I believe that the consent decree requires the interpretation given it by the district court and that the interpretation adopted by the majority is unwarranted by either the language of the decree, the extended course of compliance and superintendence under the decree, or the nature and aims of the class action.

### I. *Plain Language of Consent Decree*

Although federalism concerns offer an arguable basis for *de novo* appellate review of the jurisdictional reach of a consent decree governing public institutional reform litigation,[29] the majority's plenary

---

**28.** The majority concludes that the district court had the authority to compel the Commonwealth to transfer patients from Rio Piedras, but had no jurisdiction to require that the quality of the treatment provided to transferred patients at the collateral facilities would conform to the stipulations in the consent decree. Thus, ironically, the majority would give the district court *more* authority over the Commonwealth than it would have under plaintiffs' interpretation, which would leave the Commonwealth with the unfet-

tered right to determine for itself whether to achieve compliance through on-premises improvements or patient transfers, or, as the defendants in fact elected to do, by a combination of means.

**29.** The majority posits the theory that federalism concerns are heightened when a federal court purports to interpret a provision defining the number of institutions with respect to which a State accedes to the exercise of federal court

scanning of the plain language of the consent decree substitutes appellate interpretation of the stipulations of the parties for the interpretation of the superintending court, unconstrained even by the "ordinary contract principles" alluded to by the majority.

The proper interpretation of a consent decree basically presents a question of law, as does the preliminary determination whether the disputed language is ambiguous. *See AMF, Inc. v. Jewett,* 711 F.2d 1096, 1100–01 (1st Cir.1983); *Massachusetts Ass'n for Retarded Citizens, Inc. v. King,* 668 F.2d 602, 607 (1st Cir.1981) (citing *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975)); *see also Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1083 (1st Cir.1989). The majority suggests that the terms "institution" and "Rio Piedras Hospital" were used interchangeably and synonymously throughout the decree, and that perhaps the definition of "institution"—as consisting of the "Commonwealth of Puerto Rico Psychiatric Hospital as presently constituted or in Decentralized form"—was included merely to ensure that an internally-restructured facility at Rio Piedras, or any other mental health facilities subsequently placed under the *direct administrative control* of the Rio Piedras Hospital, would be covered by the terms of the decree.

The massive overcrowding at the Rio Piedras facility in 1977 manifested to all the parties that the *system of care* provided at Rio Piedras in 1977 might well be "decentralized" over time. Yet the parties could not then know, with any precision, which or how many collateral mental health facilities would be needed to accommodate the patients who would have to be transferred

from Rio Piedras.[30] Plaintiffs contend that the definition of "institution" incorporated in the decree was deliberately phrased in broad terms because the parties needed to make express allowance for future contingencies as to what form the systemic "institution" ultimately would take. Such inherent flexibility is one of the major advantages of utilizing consent decrees in public institutional reform litigation. Thus, even assuming that we are to confine ourselves to a "four corners" interpretation of the decree, as advocated by the majority, I cannot agree that the majority has demonstrated that its interpretations of "institution" and "decentralized form" are permissible in light of the explicit language of the consent decree.

First, the majority converts the pivotal definition of "institution" into virtual surplusage by suggesting two implausible reasons for its inclusion in the consent decree. Because the particular array of services provided at the Rio Piedras facility was almost certain to change during the course of the Commonwealth's compliance, the majority posits the theory that the parties included the definition of "institution" only to ensure that the stipulations in the decree would continue to apply to this *internally-restructured* facility. We should be very reluctant to conclude that prominent language in a decree, which has received the imprimatur of the parties and the superintending court, is superfluous and without legal import. *See, e.g., Systemized of New England, Inc. v. SCM, Inc.,* 732 F.2d 1030, 1034 (1st Cir.1984); *J.E. Faltin Motor Transp., Inc. v. Eazor Express, Inc.,* 273 F.2d 444, 445 (3d Cir.1960). The majority fails to explain why, if the Rio Piedras facility were to remain an intact entity at its original location, the simple phrase "Rio

jurisdiction, but not when the federal court defines the "details" of the implementation of a particular policy set out in a decree. The reality is, however, that a federal court's definition of the *physical* reach of its jurisdiction may pose less unforeseen burdens on the State than may result from the broad brush policy implementation permitted by the majority.

**30.** The majority asserts that plaintiffs' proposed interpretation of "decentralized form" is far

broader than the definition of the remedy demanded in the complaint. This assertion overlooks the dynamic of the negotiation process that typically follows the commencement of public institutional reform litigation. Moreover, at the outset the plaintiffs were seeking to correct *conditions* at the hospital, but could not be expected to outline in their *complaint* the particular *means* the Commonwealth would elect or be required to utilize to bring about the necessary improvements.

Piedras Hospital" would not have sufficed to ensure the application of the stipulations to the restructured facility. Under the majority's interpretation, any further elaboration of the term "institution" would have been superfluous.

The majority next suggests that the parties may have included the definition of "institution" to encompass any new *branches* of the Rio Piedras facility opened by the Commonwealth at other locations throughout Puerto Rico and placed under the same administrative control as Rio Piedras. *See supra* at n. 4. The suggested interpretation is totally at odds with the underlying goal of the litigation and the consent decree, which was to fix the obligations of the Commonwealth to all members of the plaintiff class. We cannot plausibly suppose that the parties would have had any reason to insert in the decree a prominent provision whose only purpose would be to govern the Commonwealth's unilateral decision to "reshuffle" the organization within its Department of Health. After all, the Commonwealth ultimately controls *all* public mental health facilities in Puerto Rico, regardless of the number of discrete administrative units into which it might choose to parcel its mental health program. Given that reality, the majority fails to explain how such administrative reshuffling would even be material to the resolution of the problems to be addressed by the present litigation. By emphasizing the bureaucratic *form* of the Hospital, rather than the substantive goals of the litigation and the consent decree as a whole, the majority interpretation renders the Commonwealth's obligation totally illusory. *See, e.g., Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir.1983) (preference given to contract interpretation that does not render obligations illusory). According to the majority view, the Commonwealth would be free at any time to redefine its obligations under the consent decree, *artificially*, by placing various facilities under the *nominal* control of an administrative unit of the Department of Health separate from the Rio Piedras facility. Furthermore, under the majority's thesis, the Commonwealth would have been permitted to

effect a unilateral shutdown of the entire Rio Piedras facility, transferring all its patients to other facilities, without any further obligation to former Rio Piedras patients. I believe it inappropriate to trivialize a judicial decree in this manner, particularly a consent decree.

Second, the majority emphasizes that the decree specifically describes physical conditions at the Rio Piedras facility, while omitting any description of the physical conditions at other facilities mentioned in the decree, such as the mental health programs at Cayey and Bayamon. The majority proposes to interpret the absence of such descriptions as an indication that the stipulations in the consent decree were not meant to apply to any facility other than Rio Piedras.

The significance of the asserted "omission" must be viewed in conjunction with the broad definition of "institution" set out earlier in the consent decree. It is a common drafting technique (*expressio unius est exclusio alterius*) to omit specific examples (Cayey and Bayamon) where their inclusion might imply that the specific examples completely *exhaust* the scope of a broader category previously defined. *See generally* 2A Norman J. Singer, *Sutherland Statutory Construction* §§ 47.23, 47.24 n. 6, at 194, 203, 205 (4th ed. 1984) (discussion of *exclusio* doctrine in interpreting statutes and contracts). The inclusion of a specific description of the physical conditions at Cayey and Bayamon might well have been considered a reasonable basis for inferring that Cayey and Bayamon comprised the entire fixed "decentralized form" of the Hospital, and that no other collateral facilities, such as Guerrero, could have been considered part of the "institution" in the future. Thus, the "omission" relied on as support for the narrower interpretation advanced by the majority provides persuasive support for the interpretation given by the district court.

Furthermore, as previously noted, the particular physical conditions at Cayey and Bayamon were *not* the primary or immediate focus of the consent decree. The decree requires that the Rio Piedras facility

be brought into compliance with the stipulations in the decree. At such time as the Commonwealth were to achieve compliance at the Rio Piedras facility, the court would be required to determine that the collateral support facilities to which Rio Piedras patients had been transferred in order to achieve compliance at Rio Piedras were also in compliance with the minimum standards stipulated in the consent decree. Conceivably, the Cayey and Bayamon facilities might not have remained as permanent parts of the "institution" if, between 1977 and 1989, the Commonwealth decided that the patients initially transferred to those facilities would be better placed in some other collateral facility. Thus, the decree envisioned that the ultimate scope of the "institution" would remain open to final definition through reference to its culminating eventuality, the achievement of full compliance with the consent decree by the Rio Piedras facility.

Third, the majority suggests that the provisions of the decree relating to the internal procedures for screening the medical requirements of incoming and transferring patients demonstrate that the terms "institution" and "Hospital" are used interchangeably by the parties. The interpretation of a pivotal provision in a consent decree should not be approached under the assumption that it is the product of poor draftsmanship or an indiscriminate use of terms. Instead, at least when the resulting interpretation fully accords with the language and context of the consent decree, it is appropriate to credit the parties with a mutual intention to use different terms to import distinctive meanings. Read in context, the language cited by the majority does not equate the terms "Hospital" and "institution." Rather, it is clear that the screening provision prescribes distinct requirements for *intra*-institutional patient transfers, namely transfers of patients between Rio Piedras and its collateral component facilities, and *inter*-institutional patient transfers, namely transfers of patients from outside the "institution" into Rio Piedras or one of its collateral facilities.[31]

Finally, the majority notes that Section B, which contains *both* the definition of "institution" *and* the list of stipulations, is prefaced by the heading "Standards to be Observed at the *Psychiatric Hospital*." By equating the heading's reference to "Psychiatric Hospital" with "Rio Piedras," the majority suggests that the parties would have used the term "institution" or "covered facilities" in the heading if they had intended to apply the stipulations to facilities other than Rio Piedras, which constituted the entire psychiatric hospital at the time of the decree.

---

**31.** The first sentence provides that "Mental Health Centers which refer patients to the San Juan Psychiatric Hospital shall make a preliminary evaluation of the mental condition of such patient." This provision ensures that non-acute patients will no longer be transferred to the Rio Piedras facility from other collateral facilities of the "institution" unless they need the type of intensive care provided at Rio Piedras.

The second sentence, broader in scope, provides that "[e]ach patient who is referred to the institution must be preliminarily evaluated by the Emergency Room Physician prior to admission to determine whether he should be admitted." Under this provision, if a patient is transferred into the "institution," as defined in the decree, from any facility *outside the institution,* the patient must be evaluated at Rio Piedras to ensure that he is placed in the appropriate component facility (pre-hospital facility, hospital facility, post-hospital facility), or that he is denied admission if he will not benefit from any of these treatment programs.

The third sentence provides that "[i]f admitted, within two weeks days [sic] of his or her admission to the institution each patient is to be evaluated by the physician assigned to the ward where the patient has been placed." This provision merely requires that the institution place admitted patients in appropriate "wards" within a particular component facility. It is designed to prevent repetition of the problems previously encountered at Rio Piedras where patients often were grouped together "according to their geographical origin, regardless of their mental condition and needs." The term "ward," which is not defined in the decree, certainly is not so precise or exclusive that it could only refer to sections or divisions at the Rio Piedras facility. Presumably, other collateral facilities of the "institution" might segregate patients into different sections according to their medical needs. For example, the Guerrero facility apparently is divided into modules containing fixed numbers of patients and beds, since a 144-bed module has been set aside to receive patients transferred from Rio Piedras.

Contrary to the majority's contention, heading "B" refers generically to the "Psychiatric Hospital," and not to the "San Juan Psychiatric Hospital," the term reserved elsewhere in the decree to denote the Rio Piedras facility. If indicative at all, heading "B" merely suggests that the parties contemplated, at the time of the decree, a basic hospital structure different than the one then existing at Rio Piedras. Moreover, a cardinal rule of contract interpretation requires that no individual provision, even a heading, be interpreted in isolation from its context within the document as a whole. *See Spartan Industries v. John Pilling Shoe,* 385 F.2d 495, 499 (1st Cir.1967); *cf. United States v. Roemer,* 514 F.2d 1377, 1380 (2d Cir.1975) (rule of statutory construction gives precedence to detailed text over generalized headings). The definition of "institution" is the first substantive provision following heading "B," a prominence further emphasized by the fact that the lengthy list of definitions of which it is part is not arranged alphabetically. It seems almost certain that the only reasonable justification for placing the definition of "institution" in section B was to define the coverage and reach of the stipulations *contained in the very same section.* This definition makes clear that the form of the hospital at the time of the consent decree (*i.e.,* Rio Piedras) might not be determinative of the scope of the stipulations should the Hospital ultimately decentralize its services.

The district court interpretation ascribes meaningful import to the disputed language, consistent with the overall purposes of the other provisions of the consent decree. The majority has not demonstrated that the decree is ambiguous, so as to warrant an alternative interpretation of the terms "institution" and "decentralized form."

## II. *Ambiguity and Extrinsic Evidence of Intent*

Assuming, *arguendo,* that the disputed terms of the decree are ambiguous, however, I cannot agree that the district court interpretation is not due considerable deference. The majority asserts that our normal deferential stance toward district court interpretations in public institutional reform litigation is inappropriate when the disputed language in the consent decree involves the important question of jurisdiction, rather than mere modes of compliance with the terms of the decree. If an ambiguous decree must be interpreted as any other contract, however, the majority does not explain why the district court cannot be permitted to employ "ordinary contract principles" which look beyond the confines of the "four corners" of the contract or decree to determine the true intent underlying the parties' use of the disputed language. Our customary "deference" to the trial court in every other case of contract interpretation is based on the recognition that the trial court is better situated to appraise the probative value of this type of extrinsic evidence. I believe that the majority opinion not only unnecessarily restricts the interpretive inquiry to the "four corners" of the consent decree, but discards appropriate interpretive tools for discovering the intent of the parties as expressed in their consent decree and undervalues the district court's superior opportunity to evaluate the pertinent extrinsic evidence developed during the course of its superintendence of public institutional reform litigation.[32]

32. We consistently have held that its more direct exposure to public institutional reform litigation entitles the district court to considerable deference, even in cases where the particular district court judge whose ruling is before us on appeal is not the judge who approved the original consent decree:

Appellants argue that deference is not warranted here because the ... decrees were entered by one judge, and three other judges have presided over this case. Furthermore appellants argue, the trial judge was "entirely uninvolved" in the case until the eve of trial. This argument is without substance. *It is the district court as an institution that merits deference.* We are unwilling to develop a litmus test for use in analyzing *the depth of a trial judge's familiarity with a case* in order to determine the resulting deference to which he or she is entitled.

*Pearson v. Fair,* 935 F.2d 401, 409 (1st Cir.1991) (emphasis added); *see also Langton v. Johnston,* 928 F.2d 1206, 1222 (1st Cir.1991) ("The district court, albeit in the person of a series of [five]

I cannot agree that the district court improperly relied on the parties' post-decree conduct either to "revise" retrospectively the terms of the decree or to deprive the Commonwealth of its original bargain. Concededly, although the court was at all times acutely mindful of the parties' understanding of the scope of the decree, its opinion does not contain a detailed analysis of the language of the decree.[33] Instead, the district court chose not to base its decision on the ground that the phrase "decentralized form" was unambiguous as a matter of law. Assuming some latent ambiguity, the court opted to examine extrinsic evidence to determine the intent underlying the jurisdictional provisions in the consent decree.

In earlier cases treating the proper interpretation of an ambiguous consent decree, the Supreme Court implicitly confined the proper focus to the "four corners" of the decree, abjuring recourse to extrinsic evidence. *See United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). In later caselaw, however, the Supreme Court disparaged such a narrow reading of *Armour*:

> Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, *as with any other contract.* Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of *Armour*.

*United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975) (emphasis added). As noted, this type of "extrinsic evidence" analysis does not seek to *modify* the terms of the original consent decree without the parties' consent. Rather, as with all other methods of contract interpretation, the court may use extrinsic evidence to discover the *original* intent of the parties in settling upon the particular language used in the consent decree. *See, e.g., Raymond Keith Foster, Keith Foster Mfg. Co. v. Hallco Mfg. Co.*, 947 F.2d 469, 482 (Fed.Cir. 1991); *United States v. O'Rourke*, 943 F.2d 180, 187 (2d Cir.1991); *North Shore Labs. Corp. v. Cohen*, 721 F.2d 514, 519, 520 n. 5 (5th Cir.1983).

Under a well-established rule of contract interpretation, the court may look to the parties' *post-contract* course of conduct and performance to ascertain the "practical interpretation and application" that the parties themselves attached to ambiguous contract language:

> In the process of interpretation of the terms of a contract, the court can frequently get great assistance from the interpreting statements made by the parties themselves *or from their conduct in rendering or in receiving performance under it. . . .* The process of practical interpretation and application, however, is not regarded by the parties as a remaking of the contract; nor do the courts so regard it. Instead, it is merely *a further expression by the parties of the meaning that they give and have given to the terms of their contract previously made.* There is no good rea-

---

different judges, has been the central figure in monitoring the extent and adequacy of services provided at the Treatment Center over the better part of the last two decades.").

**33.** The district court opinion did note, however: Plaintiffs claim that the term "in decentralized form" demonstrates that the parties understood, when they negotiated the stipulated agreement, that the Hospital might in the future be decentralized by relocating its pre and post hospital services, that this process was in fact begun and is continuing under Plan 3, and that the parties intended from the beginning that Hospital patients decentralized or

deinstitutionalized would continue to be members of the Class covered by the stipulations. *The Court considers plaintiffs' interpretation of the parties' intent to have considerable merit,* but finds no need to rely on it in view of the analysis which is fully developed in this opinion of the acceptance by the parties since 1985, until October 1989, that the Hospital's full compliance depended on a systemic approach, covering not only the services it rendered directly, but as well its support system of pre and post hospital services. (Emphasis added.)

son why the courts should not give *great weight* to these further expressions by the parties, in view of the fact that they still have the same freedom of contract that they had originally. In cases so numerous as to be impossible of full citation here, the courts have held that evidence of practical interpretation and construction by the parties is admissible to aid in choosing the meaning to which legal effect will be given. Oral testimony is admissible and frequently is absolutely necessary, *even in cases where the terms are fully "integrated" in writing,* to demonstrate the application of the terms to the property, persons, and events to which they are related. *The parties may employ language the application of which they know to be uncertain* and to which they are too indifferent at the time of executing the contract to take the trouble to make certain. This does not prevent the existence of a valid contract; but *it causes much greater dependence to be put upon their subsequent practical interpretation and construction.*

3 Arthur L. Corbin, *Corbin on Contracts* § 558, at 249–253 (1960) (emphasis added). Through the performance rendered by the parties, the court gains invaluable insight into the practical interpretation mutually intended by the contract language. *See, e.g., U.S.I. Properties Corp. v. M.D. Constr. Co., Inc.,* 860 F.2d 1, 10 (1st Cir. 1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1988).

Unlike a simple contract action where the post-contract conduct of the parties usually must be presented to the court in the form of controverted extrinsic evidence, much relevant post-*consent decree* conduct in public institution reform litigation takes place *before the district court* in the course of its ongoing superintendence of the performance required under the decree. During the required performance, the district court is uniquely positioned to evaluate typical modes of expression by the parties and the significance of their silence or acquiescence in the face of representations by the court and the conduct and representations of opposing parties. It seems most appropriate that district court *findings based on extrinsic evidence* should be reviewed for clear error only. *See, e.g., Fox v. United States Dept. of Hous. & Urban Dev.,* 680 F.2d 315, 319 (3d Cir.1982) (resort to use of extrinsic evidence in interpretation of consent decree converts issue to one of fact). Thus, it seems particularly inappropriate in the present context to deny deference to the district court's interpretation of the consent decree.

The record provides overwhelming support for the district court findings in this case. The court found that the Commonwealth, by its course of compliance over a period of *twelve years,* indicated that it intended to accede to district court jurisdiction over any support facilities needed to *decentralize services* previously administered on the Rio Piedras premises. The court based its findings on several factors.

First, the court noted that in several reports made prior to the Secretary of Health's submission of Plan 3, the Special Master repeatedly emphasized "the systemic approach to securing compliance [with the decree]." [34] In fact, immediately prior to the submission of Plan 3, the Secretary provided the Master with *budgetary information* that covered the *entire* public mental health network in Puerto Rico. The Master responded with a letter, stating that

the report's budgetary information is apparently based on *a misconception of*

---

**34.** In his third report filed in 1986, the Master described the Commonwealth's recent evaluation of a "model" mental health program in Boston (the Massachusetts Mental Health Center), which consisted of "a complex of intensive care units, a day-hospital, an inn and an array of residential facilities *scattered throughout the community* designed to satisfy the needs of the individual patient." The Master concluded that the Massachusetts model "can be incorporated into the Hospital's plan to comply with the consent decree." The Master also stated that the Commonwealth's budget for fiscal year 1986–87 "was entirely inadequate to bring the Hospital *and its supporting mental health services into compliance with the consent decree,*" and again, later in that report, stated that "[a]t that budgetary level neither the Hospital *nor the mental health programs on which it must rely* could possibly come into compliance."

*the scope of the Court's jurisdiction.* The Court's authority does not encompass the entire mental health system of Puerto Rico, but *only the following:* the Rio Piedras Psychiatric Hospital, pre-hospital facilities such as mental health centers and out-patient clinics which service patients who otherwise would be treated by the Hospital, and post-hospital transitional and related services which receive the Hospital's discharged patients.

Thus, the district court reasonably found that Plan 3 contained a commitment by the Commonwealth to "deinstitutionalize" the Hospital, which included the later transfer of patients to Guerrero.

Second, while the Commonwealth contends that it immediately filed a timely objection to the scope of the district court's jurisdiction as proposed by the Secretary in Plan 3, its so-called "objection" merely challenged the possible *extension* of the court's jurisdiction to *every* public mental health facility in Puerto Rico. Moreover, the *Commonwealth's own exception con-*

*tinued to treat the "institution" as including both Rio Piedras and its support facilities.*[35] Unquestionably, the district court appropriately treated the Commonwealth's "objection" as strong extrinsic evidence that the Commonwealth itself intended that the consent decree cover Rio Piedras and whatever facilities were used to decentralize the care of Rio Piedras patients.

Third, when the district court finally entered its order incorporating Plan 3, thereby defining its jurisdiction to include Rio Piedras' support facilities generally *and Guerrero specifically,* the Commonwealth neither objected nor appealed. This telltale silence on the part of the Commonwealth further reinforced the district court's reading of the Commonwealth "objection" to Plan 3 as an objection to any *extension* of jurisdiction to *all* mental health facilities in the Commonwealth, and not as a challenge to district court jurisdiction over Rio Piedras and its decentralized support system.[36]

**35.** The Commonwealth's exception to Plan 3's jurisdictional provisions states, in pertinent part:

> Said plan includes a description of the Mental Health Program of the Commonwealth of Puerto Rico to illustrate this Honorable Court and the Master as to the scope of the program. *The Psychiatric Hospital of Rio Piedras is only a part of said program and is the institution under the stipulations before this Honorable Court, with whatever facilities may be used to descentralize [sic] the care of said hospital's patients.* As before stated the individuals that come in contact with the primary units of the mental health program are not patients of the Psychiatric Hospital and most of the time do not become so. *The class* in the present action *is composed of the patients of the Psychiatric Hospital and the institutions wherever they may be referred to in a descentralization [sic] program* * [*See definitions of the stipulations—June 27, 1987] Defendants respectfully reiterate their request to maintain the scope of the class in the above captioned case and the stipulations agreed on by admitting from Plan # 3 those portions that apply to the Psychiatric Hospital.

Despite the Commonwealth's clear reference to the definition of the term "institution," the majority concludes that the reference was later contradicted and *limited* by the Commonwealth's final request that the court "admit[ ] from Plan 3 those portions [of the jurisdictional provisions] that apply to the psychiatric hospi-

tal." The word "admit" refers to the impending order of August 10, 1987, in which the district court would either admit or reject the individual provisions proposed in Plan 3. The objection demonstrates that the defendants would not challenge the inclusion of Plan 3's jurisdictional provisions if interpreted so as to include only the "psychiatric hospital," *therein* defined by the Commonwealth, in perfect agreement with the language of the consent decree, as "the institution ... with whatever facilities may be used to decentralize the care of said hospital's patients."

Finally, the majority states that the district court, in its order of August 10, 1987, interpreted the Commonwealth's challenge as an objection to the expansion of the court's jurisdiction beyond Rio Piedras, rather than as a narrower objection to an extension of jurisdiction beyond the "institution" to *all* mental health facilities in Puerto Rico. After generally noting that the Commonwealth had never before questioned the scope of the court's jurisdiction as opined by the Master, the district court merely concluded that the defendants had "waived *whatever claim that they might have had* about ... the scope of the stipulations." The court decided that defendants could raise *no* jurisdictional objection of any kind at that late stage of the litigation, and it never addressed the nature of the jurisdictional "objection" advanced in the exception.

**36.** In rejecting the plaintiff's equitable estoppel argument, the majority states that the transferred patients did not rely to their detriment on the Commonwealth's acquiescence or its repre-

Finally, the district court noted that the Commonwealth continued to allow tripartite evaluation visits to these transitional facilities *after 1987,* clearly indicating that the physical conditions at these facilities would be material to the issue of full Commonwealth compliance with the consent decree.[37] The majority dismisses these tripartite visits by concluding that they were "undertaken for the limited purpose of 'evaluat[ing] if transferred patients were *better off* than if they remained in the hospital.'" (emphasis added). Assuming, *arguendo,* that the district court possessed only the very limited authority to compel transfers out of Rio Piedras solely to ensure compliance with the stipulations *at Rio Piedras,* the majority offers no explanation for the Commonwealth's acquiescence to any such comparative study of conditions at the collateral facilities. The only conceivable purpose to be served by such a comparative study would have been to ensure that the minimum conditions prescribed in the stipulations were being applied throughout the "institution."

Since the case simply has not been made that the district court's findings are clearly erroneous, and its findings comport with a reasonable interpretation of "decentralized form," I believe we are required to defer to the district court's "intimate understanding of the history and circumstances of the litigation," *United States v. Commonwealth of Massachusetts,* 890 F.2d 507, 510 (1st Cir.1989), especially in a case where there can be no doubt that the district court engaged in a sensitive analysis of the principles of federalism implicated by its decision. Therefore, although I concur in Part I of the majority opinion, I must respectfully dissent from Part II.

---

sentations regarding the court's jurisdiction. On the contrary, transferred patients, as members of the plaintiff class, were *contracting* parties for purposes of the consent decree and must be deemed to have relied on the definition of "institution" contained in the consent decree. If patients who were to be transferred had been alerted that, once transferred from Rio Piedras, they would be beyond the reach of the district court's equitable powers, the plaintiff class could have prevented the Commonwealth from transferring them from Rio Piedras, thereby keeping them under the protection of the decree. Once their reasonable reliance on the Commonwealth's course of compliance with the consent decree caused transferred patients to become stranded beyond the district court's equitable powers, transferred patients inarguably suffered a legal detriment of significant proportions under the jurisdictional interpretation adopted by the majority.

**37.** There is no inequity in using the post-decree acquiescence or the practical interpretation of the consent decree by successive officials of the Commonwealth to determine the original intent of the consent decree. The general rule that one administration cannot bind its successors by its stated positions does *not* apply to government officials in the context of public institutional reform litigation. *See* Fed.R.Civ.P. 25(d); *see also Newman v. Graddick,* 740 F.2d 1513, 1517–18 (11th Cir.1984) (current state officials have authority to enter into consent decree and bind incoming successors, who upon taking office become parties to decree through automatic substitution) (citing *United States v. Swift,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932)). The practical interpretation given the original terms of the consent decree by each successive Commonwealth administration, as a substituted party to the proceedings, bears directly on our inquiry into the meaning of the consent decree.